UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:14-CV-215-FL

| | | |
|---|---|---|
| THE ADVOCACY FOR CONSUMER RIGHTS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | **BRIEF IN SUPPORT OF DEFENDANT STEVE RHODE'S MOTION TO DISMISS** |
| STEVE RHODE, et al., | ) ) | |
| Defendant. | ) ) | |

Defendant Steve Rhode submits this brief in support of his Motion to Dismiss and states as follows:

## INTRODUCTION

Plaintiff's lawsuit takes aim at important protected speech on matters of public concern. Plaintiff misses the mark. The allegedly defamatory statements identified in the complaint are either privileged, non-factual opinions or are not defamatory of the plaintiff. By definition, every defamation action must have at its heart a provably false, factual statement. This lawsuit does not. Though the plaintiff describes what impressions a reader might have or what may have been implied (neither of which is actionable), the Complaint identifies only four *specific* passages as defamatory. As explained at greater length below, none is libelous. The Complaint identifies the following four specific statements as allegedly defamatory:

> Defendant summarized a letter-writer's question as, "Is The Advocacy for Consumer Rights and Chad Pratt a Scam?"

> Defendant stated that it was "odd" that TAFCR touted "world headquarters" in Arizona but was a Nevada corporation not registered to do business in Arizona.

> Defendant stated his belief that TAFCR "is a front end marketing group that sends out advertisements and refers people to other firms."

Defendant wrote that having read TAFCR's documents and having listened to their audio, his impression was "It seems like a whole lot of conspiracy theory just to make you the mortgage victim."

Examining each of these statements individually reveals that none is actionable. Paraphrasing the reader's question of whether an organization is a scam is not the same as making an affirmative statement that it *is* a scam. Even if it were, as numerous courts have held, the word "scam" is loose, figurative speech that not sufficiently factual to give rise to a libel complaint. In a similar vein, whether something is "odd" or not is purely a matter of opinion and not libelous. There is nothing inherently derogatory or defamatory about the statement that TAFCR might be "a front end marketing group" that advertises and refers people to other firms. Such actions certainly aren't illegal, nor are they inherently disreputable. For that reason alone and regardless of whether it is an accurate description of the business of TAFCR, such a statement is not actionable. Moreover, the statement is clearly identified as "belief," and therefore opinion. The "conspiracy theory" statement is loose, figurative speech that is insufficiently precise to be actionable.

The plaintiff has no cognizable libel claim and has tried to bootstrap other claims to avoid the rigorous strictures and protections of the First Amendment. As the Supreme Court has held, and the Fourth Circuit applied, the legal insufficiency of a libel claim tolls a death knell to any pendant claim. *Zeran v. America Online, Inc.*, 129 F.3d 329, 332 (4th Cir 1997) ("Although Zeran attempts to artfully plead his claims as ones of negligence, they are indistinguishable from a garden variety defamation action."). *See Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988). For that reason, plaintiff's claims for

tortious interference and unjust enrichment must fall like dominoes behind the plaintiff's libel claim.

Finally, the plaintiff's request that this court impose a prior restraint on defendant's speech is outrageous. Prior restraints on speech and press long have been recognized as "the most serious and least tolerable infringement on First Amendment rights" and as "one of the most extraordinary remedies known to our jurisprudence." *Nebraska Press Association v. Stuart*, 427 U.S. 539, 559, 562 (1976). If the United States Supreme Court has not countenanced such extreme action even in the face of publication of classified military materials by the *New York Times* and the *Washington Post*, *New York Times Co. v. U.S.*, 403 U.S. 713 (1971), there is no question that the plaintiff here fails to come within shouting distance of justifying a prior restraint.

## FACTUAL BACKGROUND

The so-called Great Recession, which began in December 2007, set off a downward spiral in the economy and a mortgage crisis of a magnitude never before seen. Even to this day, millions of Americans struggle with home debt that exceeds the value of their homes, and they want and need answers to the question of how best to protect themselves and their families. In this same time, companies have come to life, offering to refinance mortgages, consolidate debt or make it go away altogether. The average person has neither the financial expertise nor the legal knowledge to separate the wheat from the chaff to discern what is safe or wise. In this context, they turn to economists, authors and journalists not only to provide information but also to offer opinions.[1]

---

[1] A search of Amazon alone shows 9,852 titles under the search "mortgage" and 11,546 titles under the search "real estate."

As loosely alleged in the Complaint, defendant Steve Rhode is a journalist who provides debt-related information, advice and opinions to readers through the website http://getoutofdebt.org/.[2] [DE 18 ¶¶ 12-15][3] At issue in this case are two postings that were responses to reader questions.  Both posts contained somewhat non-specific advice and answers to specific questions. The general advice and warnings are similar to the advice given by governmental agencies such as the consumer protection division of the North Carolina Department of Justice.  For example, a DOJ bulletin on avoiding investment scams advises, among other things,

> "Read all forms completely, and consult with a knowledgeable friend or trusted professional, such as a lawyer or an accountant, before you sign anything."

> http://www.ncdoj.gov/getdoc/aa135c86-649b-4ef2-ac35-670822157fdb/AVOID-SCAMS-10-1-13.aspx

One of the Get Out of Debt posts had similar advice:

> "At the very least I would implore you to get a second opinion from a real estate attorney that is licensed to practice in your state."

> [DE 18, Exhibit A]

Plaintiff's complaint focuses on answers to specific questions. The first post at issue was in response to a question from Will, who had been solicited by plaintiff to join a "mass tort lawsuit filed by Chat T-W Pratt."  [DE 18, Exhibit A] According to Will, he received a mailing from plaintiff inviting him to pay $5,000 up front, $29.95 per month and 30% of any recovery if

---

[2] The Get Out of Debt website actually is owned and operated by Myvesta Foundation, a Delaware corporation, but for the purposes of this Motion to Dismiss, defendant Rhode must accept the allegations as pleaded.

[3] Contrary to plaintiff's assertion in paragraph 16, defendant certainly has not and does not "acknowledge" that the website contains any defamatory content, which is a legal conclusion that need not be accepted by this court.

he joined a "mass tort lawsuit filed by Chad T-W Pratt." [DE 18 Attachment A] Will's inquiry ended:

> Have you heard of The Advocacy for Consumer Rights organization? Do you know of any legitimate firms or organizations that can help me obtain a loan modification?

The essence of Will's question was, "Is TACFR legitimate or is it a scam?" Defendant's responsive posting contained general advice of the nature described above and disclosed what research he had done. Defendant included links to each of the sources he reviewed. Defendant also expressed the opinion that it was "odd" that the TACFR website touts a headquarters in Lake Havasu City, Arizona, but actually is a Nevada corporation that was not registered to do business in Arizona. While the solicitation to Will was to join a class action suit, the TACFR website stated that calls will be routed to a "Case Manager." TACFR stated:

> We are not a law firm and do not provide legal advice. If you have any questions or concerns regarding a legal issue, we encourage you to seek the advice of an experienced attorney. Depending on the review of your situation, we may advise you seek the council of an experienced attorney.

Based on this information, all of which was disclosed in Rhode's posting, the defendant expressed the conclusion: "This leads me to believe the company is a front end marketing group that sends out advertisements and refers people to other firms."

The second posting at issue in this case resulted from an inquiry from Tina. Tina described that she received a solicitation from TACFR, which claimed to have conducted an "in depth review" of Tina's Deed of Trust and "documented extensive fraud" on her loan. [DE 18, Exhibit B] Tina relayed TACFR's opinion that she had a very good case against Wells Fargo. She stated that TACFR described her two options as paying $5,000 and 30% of a recovery to Chad Pratt or "the controversial Whistleblower program." Tina also relayed a link to a 19-

5

minute audio of TACFR's description of mortgage fraud. She said, "Would love your feedback on THIS."

As with the answer to Will's question, defendant responded that he had reviewed the materials sent, including the audio file. Defendant provided both on his post. Defendant stated his "*impression*": "It seems like a whole lot of conspiracy theory just to make you the mortgage victim."

## LEGAL ARGUMENT

I.    Choice of Law

At heart, plaintiff's complaint is for libel, with claims for tortious interference and unjust enrichment thrown in for good measure. Noted First Amendment scholar Rodney Smolla has written that "chaos dominates" the choice of law in defamation cases, and he quotes William Prosser's statement that "Choice of law in defamation cases is a dismal swamp, filled with quaking quagmires, and inhabited by learned but eccentric professors who theorize about mysterious matters in a strange and incomprehensible jargon." SMOLLA, THE LAW OF DEFAMATION §12:30 (2000).

In the complaint, plaintiff alleges that "Defendant's tortious actions, upon which the allegations in this Complaint are based, were taken in North Carolina." [DE 18 ¶ 5] Defendant vigorously denies that he did anything tortious but concurs that whatever he did, he did it in North Carolina. Moreover, a decision from our neighbor, the Western District of North Carolina, found North Carolina law to apply to libel claims arising from a newspaper article published in North Carolina.

> It is well established that "the place of a wrong is in the State where the last event takes place which is necessary to render the actor liable for an alleged tort." *Farmer v. Ferris*, 260 N.C. 619, 627, 133 S.E.2d 492, 498 (1963). In this case, the republication of the article, which is the last act necessary to render the News and

6

Record liable for an alleged tort, occurred in North Carolina. Thus, North
Carolina law, not Texas law, applies to Plaintiff's claims.

*Ouazzani-Chadi v. Greensboro News & Record*, 2007 WL 1362389 (M.D.N.C.), 2 (M.D.N.C.

2007).

Because plaintiff's legal claims are easily dispatched by constitutional principles

expounded by the U.S. Supreme Court, however, this court need not reach the question of

whether the law of North Carolina or Arizona applies. Because the failure of the libel claim

disposes of plaintiff's other claims, the court need not reach the choice of law question on the

tortious interference and unjust enrichment claims.[4]

## Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint.

*Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). While a court must treat the factual

allegations in the complaint as true, it need not "accept the legal conclusions drawn from the

facts" nor accept "unwarranted inferences, unreasonable conclusions, or arguments." *Kloth v.

Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006). To survive a motion to dismiss, the

"'[f]actual allegations must be enough to raise a right to relief above the speculative level' and

have 'enough facts to state a claim to relief that is plausible on its face.'" *Wahi v. Charleston

Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007)). Facial plausibility requires "factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.

---

[4] Because the law that governs a particular claim depends upon the location of the last action
necessary to establish the claim, the applicable choice of law can vary by claim. If the court
should look to either state for substantive law, North Carolina law governs all publication-based
claims.

*Iqbal*, 556 U.S. 662, 678 (2009). It is not sufficient for a complaint to tender "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

II.     <u>Defendant's Statements Are Not Actionable Libel</u>.

 *A. Defendant's Statements Were Protected Opinion Speech.*

 As the United States Supreme Court has recognized, only certain **types** of speech can give rise to libel claims. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990). Statements of opinion about matters of public concern that do not contain or imply facts that are provable as false are not actionable. *Id.* The Supreme Court has held consistently that such statements cannot form the basis for an action sounding in defamation. In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), the Court held that opinions about matters of public concern receive substantial constitutional protection under various First Amendment principles. Among those principles are those established in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986), and reiterated in *Milkovich*:

> Foremost, we think Hepps stands for the proposition that a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved. . . . Hepps ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.

*Id.* at 19-21 (footnote omitted).

 Similarly, courts consistently have held that name-calling and insults do not give rise to claims for defamation. "'No matter how obnoxious, insulting or tasteless' certain odious comments may be, they are 'a part of life for which the law of defamation affords no remedy.'" SMOLLA, THE LAW OF DEFAMATION 4.8 at 4-19 (quoting *McCausland v. City of Atlantic City,* 2006 WL 1451060 (N.J. Super. Ct. App. Div. 2006)). As the Fifth Circuit put it, "Mere general

abuse and scurrility, however ill-natured and vexatious, is no more actionable when written than spoken …" *Curtis Pub. Co. v. Birdson*g, 360 F.2d 344, 348 (5th Cir. 1966).

Courts also have protected speech that was laden with rhetorical hyperbole. The Supreme Court found no liability for the use of the word "blackmail." *Greenbelt Coop. Pub. Ass'n v. Bresler*, 298 U.S. 6 (1970). Justice Stewart wrote for the court that imposition of liability for use of the word "blackmail" was constitutionally impermissible. The word "blackmail" was "no more than rhetorical hyperbole, a vigorous epithet used by those who considered [Plaintiff's] negotiating position extremely unreasonable … To permit the infliction of financial liability … would subvert the most fundamental meaning of a free press, protected by the First and Fourteenth Amendments." *Id.* at 14.

Similarly, in *Letter Carriers v. Austin*, 418 U.S. 265, 269 (1974), the Supreme Court reiterated that there must be a statement of fact, and use of the term "scab" in the midst of a union dispute was not such a statement. Likewise, a protester at an abortion clinic does not commit slander by shouting "murderer" before a crowd as the clinic's physician walks by. That term is understood in its figurative sense, despite the fact that there could be a libelous use of the word "murderer." *See Renner v. Donsback*, 749 F. Supp. 987 (W.D. Mo. 1990).

Indeed, Professor Smolla has written, "[a]lmost any word, no matter how emotionally charged or pejorative, can in a given context be merely a hyperbolic figure of speech, not a literal misstatement of fact injurious to reputation." SMOLLA, THE LAW OF DEFAMATION ' 4.13 at 4-23 to 4-24. In *Mattel, Inc. v. RCA Records, Inc.*, 28 F. Supp. 2d 1120 (C.D. Cal. 1998), the court considered comments that used the phrases "bank robber," "heist," "crime" and "theft," and found that in context, those statements were not factual statements and were not actionable. *See also Rosenaur v. Scherer*, 88 Cal. App. 4th 260, 274, 105 Cal. Rptr. 2d 674 (2001) (defendant

purportedly called plaintiff a "thief" and stated that property at issue was owned by "a

partnership of speculators based in Los Angeles"); *Ruiz v. Harbor View Community Assn.*, 134

Cal. App. 4th 1456, 1472-1473, 37 Cal. Rptr. 3d 133 (2005).

As noted above, defendant's paraphrase of Will's question, "Is TACFR a scam?" is not

the same as saying TACFR *is* a scam.  As the Fourth Circuit adopted from a trial court opinion:

> Fundamentally, the Greve article raises questions about the Gift Pac project. In
> the Court's view, it is a story constructed around questions, not conclusions. But
> the mere raising of questions is, without more, insufficient to sustain a defamation
> suit in these circumstances. Questions are not necessarily accusations or affronts.
> Nor do they necessarily insinuate derogatory answers. They may simply be, as
> they are here, expressions of uncertainty.

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1098 (4th Cir. 1993).

Likewise, here, neither Will nor defendant formed a conclusion. Neither cast the question

as an "accusation or affront." Defendant's use of a question mark in the headline clearly

indicates to the reader that the uncertainty, not a conclusion, is the focus of the post.

Even if defendant were saying TACFR is, conclusively, a scam, that statement would be

one of opinion and would not be actionable.  Often in reliance on *Milkovich,* courts across the

country have found the term "scam" or similar monikers to be exactly the type of non-literal,

figurative speech that cannot give rise to a libel claim.  *See McCabe v. Rattiner*, 814 F.2d 839,

842 (1st Cir. 1987) ("The lack of precision makes the assertion 'X is a scam' incapable of being

proven true or false."); *Biro v. Conde Nast*, 883 F.Supp.2d 441, 463 (S.D.N.Y. 2012) ("the use of

the terms 'shyster,' 'con man,' and finding an 'easy mark' is the type of 'rhetorical hyperbole'

and 'imaginative expression' that is typically understood as a statement of opinion."); *NBC

Subsidiary (KCNC-TV), Inc. v. Living Will Center*, 879 P.2d 6, 11 (Colo. 1994) ("Applying these

standards to the broadcasts at issue here, we are convinced that the terms 'scam' and 'taken' as

well as the substance and gist of the broadcasts neither contain or imply a verifiable fact nor can

they reasonably be understood as an assertion of actual fact about LWC's product.") *Horowitz v. Baker*, 168 Ill. App. 3d 603, 609, 523 N.E.2d 179, 183, 119 Ill. Dec. 711, 715 (Ill. App. 3 Dist.,1988) ("We perceive Baker's use of the terms 'sleazy', 'cheap', 'pull a fast one', 'secret' and 'rip-off' to describe the transaction as no more than 'rhetorical hyperbole.'").

Even more rhetorical and less capable of being proven or disproven is defendant's observation that plaintiff's Nevada incorporation and non-registration in Arizona was "odd." Much as beauty is in the eye of the beholder, what is odd or not is purely a matter of personal conclusion. Indeed, it is impossible to forecast what evidence plaintiff would put forth to disprove that defendant found it "odd" that a Nevada company with an Arizona resident as president and headquarters in Arizona had not registered to do business in Arizona.

Finally, in answer to Tina's question about TACFR, and ***with*** a link to the audio recording which informed his opinion, defendant wrote, "It seems like a whole lot of conspiracy theory just to make you the mortgage victim." Again, the use of the term "conspiracy" is loose, figurative language. In *Horsley v. Feldt*, 304 F.3d 1125, 1130 (C.A. 11 2002), the court considered the statements made by the executive vice president of the National Organization for Women during a CNN interview. In *Horsley*, the defendant was speaking about an anti-abortion activist and an internet website known as "the Nuremberg Files," which listed the names of abortion providers. She said:

> You have the blood of these doctors on your hands, because you have incited and you have inspired and *conspired with others to result in what exactly has happened, that these doctors have been murdered.* And until the United States government starts treating these, instead of treating them as isolated incidents, starts treating them as the conspiracy that they are and starts putting the same resources into these murderers that went into the Olympic bombings, that went into the World Trade Center bombings, we are going to see this continue to happen. Doctors and clinical workers will die.

*Id.* at 1132 (emphasis in original). The court found Gandy's remarks to be "loose, figurative language that no reasonable person would believe presented facts . . . lusty and imaginative expression[s] of the contempt felt by [her] towards [Horsley]." *Id.* (internal citations omitted).

Even more than in the incendiary accusation of conspiracy to murder in *Horsley*, in the present case, it is apparent on its face that the defendant used the term "conspiracy" in a rhetorical fashion, not as a legal accusation. Because there is no legal claim for making someone feel like a victim, there can be no legal claim for a so-called "conspiracy" to make someone feel like a victim. Even the tone of the statement – "It seems like a whole lot of conspiracy theory" – is non-specific and includes the qualifier "seems," indicating an opinion. *See Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998) ("the context and 'general tenor of the article,' indicate that the piece contains constitutionally protected subjective views"); *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 729 (C.A.1 (Mass.) 1992) ("The sum effect of the format, tone and entire content of the articles is to make it unmistakably clear that Kelly was expressing a point of view only. As such, the challenged language is immune from liability.").

To fully consider the post at issue, it must be read and considered in its entirety.

> Notwithstanding the non-actionability, in isolation, of the various statements we discussed in Part III, we would err if we did not consider the article as a whole. A magnifying glass is no aid to appreciating a Seurat, and the pattern of a complex structure is often discernable only at some distance.

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1098 (4th Cir. 1993). To the degree the court finds defendant's use of the word "conspiracy" to be factual, it is parallel to and arose out of plaintiff's own assertion that 38 banks "engineered" mortgage documents to take advantage of borrowers. "It's engineered. It's not a mistake."[5]

---

[5] Plaintiff attached the defendant's post as Exhibit B to the Complaint, but the post, including the audio, can be reviewed at defendant's website.

B. Defendant's Posts Were Not Defamatory.

In addition to complaining of defendant's opinions, plaintiff complains of defendant's

conclusion that TAFCR "is a front end marketing group that sends out advertisements and refers

people to other firms." For purposes of this motion, the court need not conclude whether this

statement is accurate. Rather the court need only consider whether it is defamatory *per se*.

Plaintiff has pleaded no defamation theory other than defamation *per se*, and thus the court must

answer the threshold question of whether the statement is defamatory on its face, considering

nothing else. The Restatement formulation of whether something is defamatory at all is whether

it "tends so to harm the reputation of another as to lower him in the estimation of the community

or to deter third persons from associating or dealing with him." RESTATEMENT OF TORTS (2d) §

559. To be libelous *per se*, a statement "must be susceptible of but one meaning and of such

nature that the court can presume as a matter of law that they tend to disgrace and degrade the

party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and

avoided.'" *Whitaker v. Nash County*, 2012 WL 3840375, 18 (E.D.N.C. 2012) (quoting *Tyson v.

L'Eggs Products, Inc.*, 84 N.C. App. 1, 10–11, 351 S.E.2d 834, 840 (1987)).

More specifically, a statement potentially is libel *per se* if it

(1) charges that a person has committed an infamous crime; (2) charges a person
with having an infectious disease; (3) tends to impeach a person in that person's
trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or
disgrace.

*Cherry v. United Parcel Service, Inc.*, 2009 WL 8641019, 9 (E.D.N.C. 2009) (quoting

*Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 29, 568 S.E.2d 893, 898 (2002)).

In this case, the conclusion that it appears TACFR "is a front end marketing group

that sends out advertisements and refers people to other firms" is not defamatory, much

less defamatory *per se*. The tentative conclusion is based upon information that is

13

disclosed to the reader.  Defendant simply suggests that "anyone considering using such a company" do their homework, evaluate the particular company, "exhaust your free options first" and consider getting a "second opinion from a real estate attorney that is licensed to practice in your state."  This same advice should likely be applied to any real estate financial decision involving any company. The post does not say or even suggest that this type of organization is illegal or in any other way improper, and it would stand the First Amendment on its head to contort and construe defendant's innocent statement as one capable of a single, defamatory meaning.

C.  Defendant's Speech Was Not Commercial Speech.

Plaintiff has let loose a red herring about whether defendant's post was commercial speech, entitled to something less than full First Amendment protection.  Applying the Supreme Court's seminal decision in *New York Times v. Sullivan*, this argument fails because the posts at issue are not commercial speech.  The *New York Times* was sued for the content of an advertisement for which the newspaper was paid.  In the words of the Court:

> The publication here was not a 'commercial' advertisement in the sense in which the word was used in *Chrestensen*. It communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern.  That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold. . . . The effect would be to shackle the First Amendment in its attempt to secure 'the widest possible dissemination of information from diverse and antagonistic sources.' Associated Press v. United States, 326 U.S. 1, 20, 65 S. Ct. 1416, 1424, 89 L.Ed. 2013. **719 To avoid placing such a handicap upon the freedoms of expression, we hold that if the allegedly libelous statements would otherwise be constitutionally protected from the present judgment, they do not forfeit that protection because they were published in the form of a paid advertisement.

*New York Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964).

In *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, the Court reiterated the "commonsense distinction" of commercial speech as speech "proposing a commercial transaction." *Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980) (quoting *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 455-456 (1978)). Plaintiff does not (and could not) allege that defendant proposed any commercial transactions. Indeed, the five books and publications on personal finance that were written by the defendant are available free for download on the challenged website. Defendant is entitled unfettered protection from the First Amendment, which fully protects the posts at issue in this case.

III.     Plaintiff's Claims for Unjust Enrichment and Tortious Interference Must Fall.

Almost 30 years ago, the Supreme Court recognized just how broadly it would apply the protections of the First Amendment. In *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), the Supreme Court overlaid the First Amendment-based actual malice standard from libel to the tort of intentional infliction of emotional distress.

Lower courts, including the Fourth Circuit recently in *Snyder v. Phelps*, have applied the *Hustler* principle to dismiss non-libel claims that arose from First Amendment-protected speech. Citing *Falwell*, the Fourth Circuit wrote that the Supreme Court has applied the First Amendment to other torts not involving reputational damages. *Snyder v. Phelps*, 580 F.3d 206, 218 (2009). This interpretation of *Hustler* was affirmed by the Supreme Court. *Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011) ("The Free Speech Clause of the First Amendment—"Congress shall make no law ... abridging the freedom of speech"—can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress.")

The Fourth Circuit reached a similar result in *Food Lion:*

> We do not reach the matter of proximate cause because an overriding (and settled) First Amendment principle precludes the award of publication damages in this case, as ABC has argued to the district court and to us. Food Lion attempted to avoid the First Amendment limitations on defamation claims by seeking publication damages under non-reputational tort claims, while holding to the normal state law proof standards for these torts. This is precluded by Hustler Magazine v. Falwell, 485 U.S. 46, 108 S. Ct. 876, 99 L.Ed.2d 41 (1988). . . . We believe that such an end-run around First Amendment strictures is foreclosed by Hustler.

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999). *See also Foretich v. Advance Magazine Publishers, Inc.,* 765 F. Supp. 1099, 1106 (D.D.C. 1991) ("It would subvert defamation law to permit a cause of action for emotional distress based on a statement held as a matter of law to be not defamatory of the plaintiff." ) A similar determination was made in *Zeran v. America Online, Inc.*, *Zeran v. America Online, Inc.*, 958 F. Supp. 1124, 1133 n. 19 (E.D. Va.), "[t]o be sure, [] is not the first plaintiff to attempt to avoid the strictures of defamation law by disguising a defamation claim as another tort.  Courts uniformly reject such attempts."), *aff'd,* 129 F.3d 329, 332 (4th Cir 1997) ("Although Zeran attempts to artfully plead his claims as ones of negligence, they are indistinguishable from a garden variety defamation action.").

This case is a garden variety libel case.  It is an unsustainable one, however, and so plaintiff reaches for alternate theories to avoid the rigorous requirements of the First Amendment.   From federal trial courts in North Carolina to the Supreme Court in Washington, D.C., courts routinely and consistently have rejected such end-runs. Because the defendant's speech is protected by the First Amendment, this court need go

no further in considering plaintiff's ancillary claims that are based on the same speech that gives rise to plaintiff's defamation claim.

IV.     Plaintiff Has No Basis for a Prior Restraint.

Prior restraints "are the most serious and the least tolerable infringement on First Amendment rights" and are "presumptively invalid." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Any party seeking to obtain a prior restraint carries a particularly heavy burden of justifying the imposition of such a restraint. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (internal quotations and citation omitted). *See also New York Times Co. v. United States*, 403 U.S. 713 (1971) (per curiam) (rejecting national security justification for a prior restraint in the Pentagon Papers case); *In re Charlotte Observer*, 921 F.2d 47 (4th Cir. 1990); *United States v. King*, 192 F.R.D. 527 (E.D. Va. 2000).

In order to sustain a prior restraint on speech, the party seeking restraint must demonstrate three things: (1) there is a danger that is serious and imminent; (2) stopping the speech will stop the danger; and (3) the remedy is no broader than necessary. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976); *New York Times Co. v. U.S.*, 403 U.S. 713 (1971); *Near v. State of Minnesota*, 283 U.S. 697 (1931). Though the Supreme Court has never upheld a prior restraint, the Court has reflected that only such communications as "publication of the sailing dates of transports or the number and location of **troops**" could justify a prior restraint. *Near*, at 716.

Alleged anticipated economic harm and the desire to remain free from criticism cannot sustain a prior restraint. "No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419

(1971).

Considering an injunction of the broadcast of a possibly economically harmful videotape, the Court reiterated the prohibitions against prior restraint.

> Although the prohibition against prior restraints is by no means absolute, the gagging of publication has been considered acceptable only in "exceptional cases." *Near v. Minnesota,* 283 U.S. 697, 716 (1931). Even where questions of allegedly urgent national security, see *New York Times Co. v. United States*, 403 U.S. 713 (1971), or competing constitutional interests, *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 559 (1976), are concerned, we have imposed this "most extraordinary remedy" only where the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive measures. *Id.* at 562.

> Federal has not met this burden here. The Circuit Court no doubt is correct that broadcast of the videotape "could" result in significant economic harm to Federal. Even if economic harm were sufficient in itself to justify a prior restraint, however, we previously have refused to rely on such speculative predictions as based on "factors unknown and unknowable." *Id.* at 563; *see* also *New York Times Co. v. United States, supra.*

*CBS, Inc. v. Davis*, 510 U.S. 1315, 1317-18 (1994).

In addition to constitutional principles, TAFCR must satisfy each specific factor necessary to procure an injunction. Drawing on *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977), the Fourth Circuit rule is that "four factors are to be considered: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest. *See Federal Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 499 (4th Cir. 1981)." *L.J. v. Massinga*, 838 F.2d 118, 120 (4th Cir. 1988).

Plaintiff cannot satisfy the test for injunctive relief. Courts have held that injury from defamation is not "irreparable harm" of the nature contemplated for justifying injunctive relief. *Alberti v. Cruise*, 383 F.2d 268, 272 (4th Cir. 1967) ("There is usually an adequate remedy at law

18

which may be pursued in seeking redress from harassment and defamation.")  By contrast, courts routinely have held that the existence of a prior restraint – for even a moment– *does* constitute irreparable harm to the speaker enjoined.  *New York Times Co. v. U.S.*, 403 U.S. 713, 714-15 (1971) (Black, concurring) ("every moment's continuance of the injunctions against these newspapers amounts to a flagrant, indefensible, and continuing violation of the First Amendment."); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) ("The Court's conclusion in *New York Times* suggests that the burden on the Government is not reduced by the temporary nature of a restraint . . . ."); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")

For the reasons outlined above, plaintiff has no likelihood of success on the merits, and the public interest in the free flow of information about matters of public concern also counsel against a prior restraint.  For all these reasons, the court should dismiss outright plaintiff's demand for injunctive relief.

WHEREFORE, Defendant Steve Rhode requests (a) that the Court dismiss the First Amended Verified Complaint and Application for Injunctive Relief filed by Plaintiff in its entirety for failure to state a claim upon which relief can be granted, and (b) all other proper relief.

Respectfully submitted this the 4th day of August, 2014.

/s/ C. Amanda Martin
C. Amanda Martin
N.C. State Bar No. 21186
STEVENS MARTIN VAUGHN & TADYCH, PLLC
1101 Haynes Street, Suite 100
Raleigh, NC  27604
Telephone: 919-582-2300

Facsimile:  866-593-7695
Email:  amartin@smvt.com

/s/ Christopher W. Livingston
Christopher W. Livingston
N.C. State Bar No. 27282
P.O. Box 220
White Oak, NC  28399
Telephone: 910-876-7001
Facsimile:  910-866-5297
Email:  chrisatty@hotmail.com
LR 83.1 Counsel

*Attorneys for Defendant Steve Rhode*

**CERTIFICATE OF SERVICE**

       I hereby certify that on this 4th day of August, 2014, I electronically filed the foregoing Notice of Appearance with the Clerk of Court using the CM/ECF system, which will send notification of such filing as follows:

       Svend H. Deal
       Cozen O'Connor, P.C.
       Suite 2100, 301 South College Street
       One Wells Fargo Center
       Charlotte, NC 28202
       sdeal@cozen.com

This the 4th day of August, 2014.

                             /s/ C. Amanda Martin
                             C. Amanda Martin
                             NC State Bar No. 21186